23-00649MB

# AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Colleen Finn, Special Agent with Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## INTRODUCTION

1. On 6/11/2023, Mario Figueroa Sr. (FIGUEROA) met with and picked up V. C. in a blue 2009 Nissan Altima (SUBJECT VEHICLE). The two drove around Menegers Village in the GuVo District of the Tohono O'odham Nation in Arizona. They drove onto a dirt road and the SUBJECT VEHICLE got stuck. FIGUEROA and V. C. attempted to free the SUBJECT VEHICLE but were unable to do so. FIGUEROA became frustrated and upset. FIGUEROA punched, kicked, and then struck V. C. with a crowbar. V. C. eventually walked away and sought help.

## PRELIMINARY BACKGROUND INFORMATION

2. I am a Special Agent of the Federal Bureau of Investigation (FBI) and am currently assigned to the Tucson office. I have been an FBI Special Agent (SA) since August 1, 2021. Prior to being an FBI SA, I was employed as an FBI Intelligence Analyst since January 10, 2016. I am currently responsible for investigating federal crimes occurring within the District of Arizona, to include violent crimes occurring in the Tohono O'odham Nation. In my capacity as an FBI SA, I have received formal and on-the-job training pertaining to violent crime investigations. The statements contained in this affidavit are based on my experience and background as a SA and on information provided by other law enforcement agents.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit this affidavit supports probable cause for a warrant authorizing the search of:

> A blue 2009 Nissan Altima with Vehicle Identification Number (VIN) 1N4AL21E69N486577, bearing Arizona license registration plate 82A7AC, currently located at Moreno's Towing in Guvo, Arizona (AZ), the SUBJECT VEHICLE

for physical evidence and the extraction and forensic examination of electronically stored information within the SUBJECT VEHICLE (as described in Attachment A) and to seize the items and data described in Attachment B. The items and data will provide evidence related to the crime of Assault with a Deadly Weapon, in violation of Title 18, United States Code, §§ 113 (a)(3) and 1153 and Title 18, United States Code, § 922(g)(1).

## JURISDICTION

5. Pursuant to 18 U.S.C. § 3052, as an FBI Agent, your affiant is empowered to enforce criminal laws of the United States and to execute search warrants issued under the authority of the United States. Pursuant to 18 U.S.C. § 3107, your affiant is empowered to make seizures pursuant to a search warrant for violation of the laws of the United States.

## PROBABLE CAUSE

6. On 6/11/2023, at approximately 0652 hours, Tohono O'odham Police Department (TOPD) responded to a residence in Menegers Dam, in the GuVo District of the Tohono O'odham Nation, within Pima County, Arizona, in reference to an assault. FIGUEROA and V. C. are registered tribal members of the Tohono O'odham Nation. On 7/18/2023, the FBI received a referral regarding the incident.

7. On 6/11/2023, TOPD met with the reporting party, Darnella Mattia (MATTIA). MATTIA reported that her sister, V. C., came to her house that morning asking for help and stated that she was assaulted by Mario Figueroa, Sr. (FIGUEROA).

8. V. C. was interviewed by TOPD on 6/11/2023 and 6/14/2023, and by the FBI on 7/19/2023.

9. During the interview on 6/11/23, V. C. told a TOPD officer that she was hanging out with FIGUEROA and the two were driving around the village. While driving on a dirt road, their vehicle got stuck. They tried to free the vehicle but were unable to do so. FIGUEROA became frustrated and upset. FIGUEROA then punched and kicked her. Later, FIGUEROA struck her with a crowbar multiple times. V. C. then ran into the desert toward Route 1 where she sought help from other individuals. The TOPD officer observed that V. C. had busted lips, a swollen cheek, bruises and scratches on her right forearm. V. C. stated that FIGUEROA was driving a Nissan sedan. When asked what her relationship was with FIGUEROA, V. C. replied, "he's just a friend." V. C. declined to press charges against FIGUEROA. Paramedics then arrived at the MATTIA residence and transported V. C. to the Sells Hospital for further evaluation.

10. TOPD attempted to locate FIGUEROA at known locations throughout the village. TOPD did not locate FIGUEROA. TOPD was advised FIGUEROA was driving a black Nissan sedan.

11. On 6/14/23, a TOPD officer met with V. C. and observed multiple bruises on V. C.'s face and body. The officer asked V. C. to describe what had happened on the day of the incident. V. C. told the officer that she had texted FIGUEROA that morning to meet up. FIGUEROA initially refused. However, later that day, FIGUEROA arrived at her house and asked her if she wanted to go with him to the casino in Why, AZ and then to Gunsight Village, AZ. V. C. agreed. On their way to the casino, FIGUEROA was smoking methamphetamine. As they headed back to Menegers Village, FIGUEROA made multiple stops. At one of the stops, FIGUEROA left his shovel. FIGUEROA became angry, began yelling at V. C.

and made V. C. look for the shovel. After finding the shovel, FIGUEROA and V. C. continued driving and drove onto a dirt road near milepost 7. At some point, the vehicle got stuck in a wash. FIGUEROA became angry as they were unable to get the vehicle out of the wash. FIGUEROA punched and kicked V. C. in the face and body. FIGUEROA punched V. C. with closed fists and kicked V. C. when she was on the ground. The punching and kicking continued for a period of time. During the night, FIGUEROA struck V. C. with a crowbar on the rib carriage area. V. C. felt a lot of pain. FIGUEROA then started using methamphetamine again. FIGUEROA told her to look for a residence. As V. C. walked looking for the residence, V. C. decided to head towards the road to seek help. She flagged down a vehicle and was then taken to her sister's house. When asked if she was willing to press charges against FIGUEROA, V. C. agreed.

12. On 7/19/23, an FBI agent met with V. C. and asked her about what had happened on the day of the incident. V. C. stated that she had messaged FIGUEROA as she needed drugs. FIGUEROA replied that he would meet her. When FIGUEROA arrived, V. C. and three of her daughters got into his vehicle. V. C. later noticed that FIGUEROA had a "40," referring to a container of beer between his legs. FIGUEROA told the girls to go back into the house as he needed to speak to V. C. FIGUEROA then left with V. C. FIGUEROA gave V. C. the beer to which she initially declined but then drank some and gave back to FIGUEROA. They stopped at a few places. As he drove, FIGUEROA was getting high. They stopped at the Y at the casino and V. C. bought some gas and two Steel Reserve cans of beer. They continued to drive around. At some point, they turned at the 7-mile wash. They stopped at a clearing. FIGUEROA offered V. C. drugs. V. C. pretended that she used the drugs. FIGUEROA got out of the vehicle, took a shovel and was digging around. FIGUEROA and V. C. returned to the car and had sex. After, they then drove through a wash and got stuck. FIGUEROA became angry. FIGUEROA sent V. C. to find his shovel which she found. V. C. returned to the car. FIGUEROA tried to jack up the car to get it out of the wash. The two took turns trying to get the

vehicle out of the wash with no success. FIGUEROA continued to use drugs. FIGUEROA then walked over to V. C. and hit her on her face. Throughout the night, FIGUEROA hit and punched V. C. on her face and body. V. C. noticed that she was bleeding. FIGUEROA would jump on top of V. C. and hit her while they were in the car. FIGUEROA then got a crowbar and hit V. C. hard. FIGUEROA pulled her hair, punched, and kicked V. C. This continued throughout the night. V. C. told the agent that during the night, V. C.'s children texted FIGUEROA asking about V. C. FIGUEROA called V. C.'s daughter and told her that they were stuck in a wash. When V. C.'s daughter asked to speak to her mom, FIGUEROA told her daughter, "no, to stop bothering them," and hung up. V. C.'s children texted FIGUEROA that they were going to call the police. FIGUEROA became angry and he began to beat V. C. again. FIGUEROA then instructed V. C. to call her children and tell them to quit calling as they were stuck in a wash and once they got out of the wash, FIGUEROA would take V. C. home. FIGUEROA then told V. C. to walk towards a house and get help. As V. C. walked to find the house, she decided to head towards the road and seek help.

13. After the incident, individuals, angry about what had happened, slashed the SUBJECT VEHICLE's tires and broke the windows.

14. On 7/6/2023, TOPD towed the SUBJECT VEHICLE to Moreno's Towing in GuVo, Arizona. The SUBJECT VEHICLE is a 2009 blue Nissan Altima, VIN 1N4AL21E69N486577, bearing Arizona registration plate 82A7AC.

15. On 8/9/2023, an FBI Special Agent observed what appeared to be the SUBJECT VEHICLE located at Moreno's Towing Company. The Agent observed in plain sight what appears to be a rifle case inside the vehicle, but it is unknown if there is a firearm inside the case. FIGUEROA is a prohibited possessor as he has been previously convicted of crime punishable by more than a year imprisonment. On June 27, 2013, FIGUEROA was convicted of Assault on a Federal Officer, a Class C felony, in the United States District Court, District of Arizona, in case CR-12-01923-TUC-RCC and was sentenced to fifteen months of imprisonment.

16. Although the SUBJECT VEHICLE is registered as blue, the SUBJECT VEHICLE is dark in color and could be seen as black. Photographs of the vehicle observed at the tow company are as follows:









17. V. C. provided your affiant with a video recording of the vehicle FIGUEROA was driving on the day of the incident. The video was taken after the windows were broken. Screenshots of a video recording are as follows:

 



18. Your affiant contacted V. C. regarding the vehicle located at Moreno's Tow Company. V. C. was unable to confirm if the vehicle was the same but believed it looked like it.

## TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS

19. Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

20. Many modern motor vehicles are equipped with sensors, cameras,[1] transmitters, and electronic control units (ECUs)[2] to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and

---

[1] As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

[2] "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

infrastructure.³ These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

21. Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

22. A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System (GPS) navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

23. A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed, or brakes were engaged.

24. The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the

---

³ The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

telematics system is for collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

25. The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

26. I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

27. As previously stated, the SUBJECT VEHICLE is a 2009 blue Nissan Altima, VIN 1N4AL21E69N486577, bearing Arizona registration plate 82A7AC.

28. To complete a forensic extraction from the SUBJECT VEHICLE, it may be necessary, temporarily, to remove trim and other components of the SUBJECT

VEHICLE to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within the SUBJECT VEHICLE. If potentially destructive processes are required to perform this extraction, parts of the SUBJECT VEHICLE may be destroyed and rendered useless.

29. Furthermore, it may be necessary to return to the SUBJECT VEHICLE and reconnect the infotainment and telematics systems to the SUBJECT VEHICLE's power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

30. The requested warrant authorizes a later review of the media and information seized or copied from the SUBJECT VEHICLE, which review may continue past the date required for execution of the warrant.

## **CONCLUSION**

31. I submit that this affidavit supports probable cause for a warrant authorizing the search of the SUBJECT VEHICLE and the seizure of physical evidence and the extraction and forensic examination of electronically stored information within the SUBJECT VEHICLE (as described in Attachment A) to seize the items and data described in Attachment B. The items and data will provide evidence related to the crime of Assault with a Dangerous Weapon, in violation of Title 18, United States Code, §§ 113 (a)(3) and 1153, and Prohibited Possessor of a Firearm, in violation of Title 18, United States Code, § 922(g)(1).

32. I swear under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Respectfully submitted,

COLLEEN FINN
Digitally signed by COLLEEN FINN
Date: 2023.09.26 15:07:41 -07'00'

COLLEEN FINN
Special Agent
Federal Bureau of Investigation

Subscribed electronically and sworn to me telephonically.
on this 26th day of September 2023

Honorable Eric J. Markovich
United States Magistrate Judge
District of Arizona

23-00649MB

# ATTACHMENT A

## DESCRIPTION OF ITEM TO BE SEARCHED

A blue 2009 Nissan Altima with Vehicle Identification Number (VIN) 1N4AL21E69N486577, bearing Arizona license registration plate 82A7AC, currently located at Moreno's Towing in Guvo, Arizona (AZ).





23-00649MB

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1. Swabs of any and all suspected blood, and/or other reddish-brown substance;

2. Any and all items containing and/or stained with any suspected blood or reddish-brown substance, including clothing;

3. Any and all hair, bodily matter, fibers, or substance similar to bodily matter, including skin, hair, and bone fragment;

4. Any and all alcohol containers;

5. Any and all receipts, documentation, or indicia indicating the whereabouts of the vehicle or its occupants on or near 6/11/2023 and ownership of the vehicle;

6. Any and all drugs or narcotics in any form;

7. Any and all drug paraphernalia;

8. Any and all crowbars, or any instruments with a sharp edge that could be used as a weapon;

9. Any firearms and ammunition;

10. The SUBJECT VEHICLE's infotainment center, on-board computer, vehicle telematics system, and any on-board electronics system or module; and

11. Any and all data or information from the SUBJECT VEHICLE's on-board computer, vehicle telematics system, and any on-board electronics system or module, including:

a. Stored electronic data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within the Vehicle, including, but not limited to:

   i. unique device identifiers;
   ii. media files;
   iii. call logs;
   iv. contacts;
   v. SMS;
   vi. Bluetooth connections;
   vii. USB connections;
   viii. voice commands;
   ix. voice recordings;
   x. voice calling;
   xi. web browser history;
   xii. Wi-Fi connections;
   xiii. speech recognition;
   xiv. time updates;
   xv. track logs;
   xvi. traction events;
   xvii. traffic updates;
   xviii. stop/start log;
   xix. GPS warnings;
   xx. hard acceleration;
   xxi. hard braking;
   xxii. light status;

    xxiii. odometer reading;

    xxiv. gear shifts;

    xxv. historical navigation data;

    xxvi. historical speed data;

    xxvii. historical event data; and

    xxviii. data streaming services and related content.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.